Good morning, let's start with my argument, talk briefly about the facts, and then we'll talk about the 404B sophistication and the error that was found in the sentencing guidelines, the errors found in the UK conviction between years 2014 and 2018. The facts are very simple. I know you're familiar with them. Dr. Patino was charged with a conspiracy with the San Luis doctor, Dr. Ted Memlitz, and Dr. Patino was sending Dr. Memlitz HGH drugs, and Dr. Memlitz was prescribing those in his mentality clinic. Dr. Memlitz pled guilty. I don't know if he pled guilty to all charges or just one of them. I think he was able to avoid prison time, and Dr. Patino took his case to trial. And I think that, as my brief demonstrates, no secret, that we think the introducing the 1997 California conviction for possession of HGH was in violation of Rule 404B. Well, we think that was an error. We think it was an error that's such much that the case should be remanded for a new trial. The California case was a case for possession. It was in 1997. This case, some of these cases, this case involved facts, I believe, in the 2014-2015 timeframe. So we believe that the court made a grave error in the 404B evidence, and I know in this circuit that's hard. It's very difficult to find almost any cases in the circuit where 404B is excluded because I think, not speaking for the circuit, but it seems like as long as you give a limiting instruction after you give a 404B, that washes it away. I think in this case, it's not. I think Judge Grunder, I think in U.S. v. Williams' opinion, you distinguish between 404B intrinsic and 404B extrinsic, being that 404B intrinsic is prior convictions that either kind of sets up or completes the story of the current matter, and extrinsic 404B, if you'll use that term, is prior convictions that really don't set up or complete any of the story. And I think that's obviously what we have here. This California possession where he, Dr. Patino, was charged with delivering HGH to an undercover agent in California had nothing to do with the underlying charge here. This one, he was sending it, sending the material to a medical doctor in Missouri, and what Mr. Mimlitz was doing, that he was prescribing it to his clients, to his patients. And I think there's some question mark even how much Dr. Patino knew about that. And I think there's even some bigger question, I don't know what his duty is on that regard. And the transactions were not sophisticated. Isn't there some relevance in the sense that it was exactly the same controlled substance? In other words, to his knowledge of what it is. That's an argument I haven't heard before. So you're saying it's not because it's an exact crime, which they say it is, which is incorrect. It's just because it's the same drug? Sure, doesn't it go to his knowledge of the drug? I mean, knowledge of the drug as far as what it does? Because there are some legitimate reasons to use HGH, right? Even in the statute it says. So I don't know how the fact that he's familiar with HGH... Well, usually the argument is you have to know that what you had was a drug and not something other than a drug. And he knew it was a drug. There's no... I mean, there's a drug that could have legitimate uses and illegitimate uses, correct? So, I mean, there's no question. I would somewhat disagree with you, Your Honor. You might expect that. But he didn't stipulate to that knowledge, did he? He didn't stipulate that he knew what HGH was or that it was a drug. No, but he knew that he possessed HGH. Yes, but remember, we're not using drug as in cocaine, marijuana, whatever. We're talking about a drug that could have some valid, legitimate purposes. So when we use that term drug in these type of courts, many times we're using it for sure. I mean, I know the fighting issue is did he know that it was being used for improper purposes, right? That may have been the fighting issue, but they still have to show the elements, which includes that he knowingly possessed HGH. And so why wouldn't the prior conviction for possessing HGH at least show some relevance, have some relevance to that? Well, for one thing, I don't think it's relevant if he's possessing HGH in the country of Mexico that he's holding it for illegal purposes. I understand that, but that's a different issue. But in this situation, I don't think even the government did a very sound job of saying that he knew that the HGH was going to be used for illegitimate purposes, right? Well, that's a sufficiency argument maybe. Yeah, I get it, but I understand that, and I respectfully disagree, Your Honor. I don't believe it was. I need to hurry up on the other ones. One, then they also argued sophistication, which the sophistication is simply not here. Dr. Mimlitz transferred money from his Missouri bank account to a bank account in the state of Texas under the same names and whatever. I mean, if we're going to call that sophistication, it's hard for me because I spent 10 years at a large regional bank to say that a sophisticated transaction is transferring money from Mr. Smith to Mr. James in the same bank account under the same names, no use of hidden transactions, something that probably happens 10 million times a day in this country. I think that's a little stretch to say that's sophistication. Counsel, what about the use of the fake e-mail addresses? Doesn't that show sophistication? Well, when you say fake e-mail addresses, I don't really know what you mean by fake. Some of these e-mails were to Mr. Mimlitz, and I think at trial they testified that they subpoenaed GoDaddy, I believe who it was, and they retrieved Mr. Mimlitz's e-mail. I don't know. Fake is, if you mean as far as they weren't obviously who they were, is that what we mean by fake? But I don't know what fake means. Well, I think the evidence was that there was use of fake e-mail addresses. I'll leave it at that. Okay. Well, you're saying the e-mail addresses were deceptive. I'm not saying that. Well, you said they were not who they appeared to be. I'm saying I was asking a fundamental question. Well, is that true? Is that true? Is that what the evidence was? I don't think there was any evidence regarding that. I was in trial, counsel, but I don't recall anything in the transcript. It was a very short trial. I don't recall anything talking about fake e-mail addresses. I thought from reading the transcripts the government easily was able to determine who were the owners of the e-mail address. And I don't think they had any problem getting that from GoDaddy. And the last thing before I run out of time is there appears to be a mistake in the pre-sentence, the PSR, in the fact that the U.K. conviction was really a 2008 conviction and not a 2014 conviction. And we believe that goes to the length of the sentence because even the government made a remark that he committed the current offense while he was serving not a sentence but under supervised release or whatever from the England, and that would have been 2014. And that entire fact would have changed if the court was apprised that it was a 2008 conviction, not a 2014 conviction. And I think on that one alone, it almost makes it remandable. That didn't affect his criminal history category, did it? Well, they kind of argue not technically, but it was an upward departure, and I believe that there was some conversation regarding that the U.K. conviction was 2014, so therefore his criminal history wasn't properly – should have been at a higher level. But I don't – I think you're right. Because the argument was just to the variance, not to the guideline calculation, right? That's correct. That is correct, Your Honor. Got it. Okay. I'll save my one minute for rebuttal. Very well. You may. Mr. Lay, we'll hear from you. Thank you, Judge. Good morning. May it please the Court. I'm Andy Lay from the U.S. Attorney's Office here in St. Louis. The government respectfully requests that the Court affirm Mr. Patino's conviction and sentence for the following reasons. I'll start, since most of the questions were about the 404B decision, with the district court's decision to admit evidence of the prior conviction, the California conviction. From a factual perspective, looking at the pre-sentence report, which is docket 65, paragraph 36, that was a distribution of human growth hormone conviction, not a possession, a distribution of human growth hormone conviction. Clearly, this evidence was relevant. All three of the counts that the defendant faced at trial had a knowledge requirement in the three counts of the indictment. But didn't he all but, and perhaps even did, concede that he shipped HGH and caused it to be shipped from Mexico? So was that really a fighting issue? So for the smuggling count, you're right that the concession that he was shipping the HGH from Mexico into the United States, that concession was a significant concession for that charge. For the human growth hormone distribution count, that was count two. The government would have to go further and show that the distribution was for prohibited purposes. It's going to go to professional wrestlers, not dwarves or AIDS patients or somebody who has a legitimate medical use. So the knowledge was a contested issue at trial for count two. What is Dr. Mimlitz going to do with it here in Missouri? What does Mr. Patino know about that down in Mexico? In opening statement, that was the- So how does the prior distribution conviction aid the knowledge that it would be used improperly? It's the similarity of the prior conviction. If you look at the prior conviction, it's not just the drug, which is a pretty unusual drug, human growth hormone. It's the method of distribution, smuggling across the border. It's the source country, Mexico. And most importantly, it's the amount of the transactions, wholesale, not retail, and the end user in the United States. The trial evidence was that the California conviction involved shipping large amounts of HGH to doctors. That's exactly what we see later in Missouri. The government's theory of the case at trial, and we presented evidence on this issue, was a common sense one. Most patients buy drugs with their insurance card, and they go to a real pharmacy to pick them up. So this distribution method where the doctor gets wholesale amounts and then charges the patient directly is unusual in the medical community. And it's an indicia in this case and in the prior conduct that something unusual is going on. Counsel, even if it was similar in kind, isn't it overly remote in time? And this was a very old conviction. So that was the argument in the district court. It was primarily a legal argument that was too old. And Patino's counsel argued that there was a presumption against any case that was over 13 or 14 years old. Here, the government would say this conviction is probably 16 years old, because that's 2014 when the transactions were occurring back to 1998 with the prior conviction. With that length of time, this is not the oldest conviction that this court has affirmed the admission of in a criminal case. Twenty years was the oldest I was able to find. And convictions this old have been repeatedly admitted in drug or conspiracy cases, which is what the charges were here. In that other case, did the defendant spend any of that time in prison? Whereas here, none of the time was spent in prison. I was unable to find a case with a 20-year conviction being admitted where there wasn't a prior incarceration sentence. However, the Eighth Circuit has repeatedly declined to adopt a bright line mathematical rigid rule. And if you balance all of the factors, which is what the district court did here, it was very similar. It was highly relevant, given what Mr. Pitino said in his opening statement. And from 20,000 feet up, I think Pitino's brief shows that the district court could have balanced the factors differently. He could have weighed the factors differently, but that doesn't by itself show an abuse of discretion. Further, the government is aware the court could disagree and find that there was some error. As the court pointed out, Mr. Pitino conceded in his opening statement that he had shipped the HGH to Missouri. The trial evidence showed that professional wrestlers were receiving the drugs. The government's expert established that the HGH that was being shipped here was not just adulterated, but also misbranded. And was created in a plant that the FDA had never manufactured from E. coli bacteria. With all that other evidence, especially with the court's two limiting instructions, any error was harmless. There's two other points I wanted to respond to on the sophisticated means issue and the sentencing issue. On the sophisticated means issue, the court is correct that there was trial evidence that Mr. Pitino used fake email addresses that suggested the existence of corporate shells. And it's in the PSR of paragraph nine, which is docket 65. But Pitino was using a whole bunch of different website and email names that suggested his distribution businesses were associated with a variety of different companies. Not just HGH.com.Mexico, but the HGH Medical Clinic of Porto Vallarta, the clinic at Swiss Mail, and another clinic he called RXMedicalWarehouse.com. These facts were undisputed in the pre-sentence report, which Mr. Pitino did not object to. So when the district court used the sophisticated means enhancement, all these facts in the PSR were undisputed. But it wasn't just the undisputed facts about the corporate entities. It was the repetitive and coordinated conduct. Again, undisputed in the pre-sentence report. 95 separate HGH packages were shipped to Missouri for 40 separate patients over a nine-month period. That's the pre-sentence report at 10 to 11. That's classic repetitive and coordinated conduct, which is what we typically see in a sophisticated means enhancement. I'd go further and point out that in the PSR, the pre-sentence report writer noted... What was the evidence on the email addresses? That's in the pre-sentence report at paragraph nine. I mean, can you just explain it? So a lot of the government's evidence were communications between Pitino and Mimlitz about HGH transactions. And in those communications, the government established that some of those communications were signed by Mr. Pitino. But in other communications, he just used emails from these various corporate shells. RX Medical Warehouse, Clinic at Swiss Mail. We admitted evidence at trial that all of those email addresses were listed by Mr. Pitino on his subscriber application to his Dr. GP account, which was his primary email account. So he was associated with all these different emails and corporate addresses. In your brief on the harmless area, you say harmless beyond a reasonable doubt. Is that the right standard? I think it's a slight influence on the verdict. I think that's the correct standard. I'm sorry, say that again. I think the harmless air standard for 404B is a slight influence on the verdict. Okay. So this is erroneous. We're not required to find it harmless beyond a reasonable doubt, are we? I don't think that's the correct standard. And I apologize that I had the wrong standard in there. Okay. Finally, with what's left of my time, I want to talk about the upward departure. The most important point is that there were three separate departures relied upon by the district court, and two of the three departures did not rely on any criminal history, calculation, score. Three separate departures or three separate grounds for one departure? Three separate grounds for one departure. Those are two different things. Thank you for the clarification. Two of the three do not rely on criminal history. The danger to patients or the alternative duty grounds do not require any criminal history whatsoever. Regarding the criminal history, the transcript reveals that the government never took a definitive position at sentencing regarding criminal history, that Mr. Patino was a criminal history category four. Instead, the government, and I tried the case in the district court. Can you move just that microphone so we can hear you? I tried the case in the district court at sentencing. We took the position he could be either a criminal history three or a criminal history four. Counsel for Mr. Patino is correct that the pre-sentence report is wrong. It's got the wrong date in it for the United Kingdom conviction, which is one of Mr. Patino's many convictions. At sentencing, since the facts in the PSR were undisputed, that's what I relied upon. When you say you didn't take a position on whether he was three or four, what do you mean by that? You mean after a departure? For the criminal history at sentencing, the government focused on the nature of the criminal history more than trying to give it an exact score beyond what the pre-sentence report writer had done. What criminal history category did the judge find that he was in before any departure? I'd have to look at the pre-sentence report. Is it a two? Then why are you saying you didn't take a position on whether he was a three or a four if he was a two? If you read the entire transcript, I just offhandedly said, had the convictions been more recent, he could have scored as high as a three or a four. All right, so what you mean is you didn't take a position on whether hypothetically, if these convictions could be counted, whether he'd be a three or a four. Exactly. Thank you. Okay, well, thank you for your argument. Thank you. Real quick. I think he was Category 1, wasn't he? Was he Category 1 or 2? You don't know either. Okay, nobody knows. We'll look it up. Go ahead. What's your rebuttal? One, the California conviction, he was selling to non-doctors. That was not the same thing here. He was selling to a valid Missouri license, Dr. Ted Millman. Secondly, I'm going to get to this harmless there. I couldn't bring it up in the appeal because it's hard to bring up ineffective assistance counsel. Mr. Mays did a great job. But it wasn't harmless. If you remember the transcript, there was a juror who called the judge the next day and says, I'm not really sure that was my verdict. And unfortunately for Mr. Mays, and maybe he did, maybe he looked up and found out what he couldn't have done, but it was a close call. And this 404, in my opinion, and I know I'll get shot down here, but you bring up 404B for one reason. You don't think your case is strong enough on the merits. And that's exactly what they did by bringing this 1997 extrinsic 404B. It wasn't set up any story. And we think it was narrow to do so. Okay, well, thank you for your argument. The case is submitted, and the court will file an opinion in due course. That concludes the argument calendar for today.